Morris Ohnstein vs. Simon L. Levy et al.—(Simon L. Levy, Appellant, vs. Arlene Meyer et al., Appellees.)

*Opinion filed May 24, 1954—Rehearing denied September 20, 1954.*

Ira D. Schultz, of Chicago, for appellant.

Oscar A. Brotman, and Abrams & Linn, both of Chicago, (Richard F. McPartlin, Jr., and William C. Wines, of counsel,) for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

In a proceeding in aid of execution or creditor's bill instituted by Morris Ohnstein against Simon L. Levy, Flora Goldberger, Arlene Meyer, and Harold Meyer, Simon Levy filed an amended countercomplaint against Flora Goldberger, his daughter, Arlene Meyer, his grandchild, and Harold Meyer, his son-in-law, to set aside certain deeds and to impose a constructive trust on property held by them. The creditor's bill was abandoned, and the circuit court of Cook County, pursuant to the recommendations of the master, denied the countercomplaint in a decree dismissing the cause for want of equity. A direct appeal therefrom has been taken to this court by Simon Levy on the ground that a freehold is involved.

It is incumbent upon this court to determine whether under the evidence adduced in the cause a constructive trust may be imposed upon the property held by the counter-defendants.

It appears that on February 20, 1922, Simon Levy, hereinafter referred to as the plaintiff, inasmuch as the controversy is essentially his claim against certain of his heirs, purchased an apartment building located at 2934-36 Logan Boulevard, Chicago, Illinois, in which he, his wife, and daughters had been residing. Shortly thereafter, his daughter Ruth married the defendant Harold Meyer, and they leased from Simon Levy a first-floor apartment in the building at a rental of $35 a month which they paid plaintiff from 1922 until March, 1950. After the death of Ruth on December 27, 1949, the rental payments were made by her husband, defendant Harold Meyer.

It is uncontroverted that there was a close relationship between Simon Levy and his daughters, Flora Goldberger and Ruth Meyer, for they visited and dined with each other daily, at which time they freely discussed personal and business matters. Both Flora Goldberger and her hus-

band, Dr. Sol M. Goldberger, testified that on November 14, 1938, when plaintiff was 72 years old, he informed his daughters that he had consulted with his good friend Louis Glanz, who was experienced in real estate and mortgage matters, and that at the suggestion of Louis Glanz he was going to convey the building and another parcel of vacant land owned by him to Louis's brother, Alex, as trustee. Under that plan, Simon Levy would still be the beneficial owner. Louis Glanz in his testimony corroborated that there was such a conversation between him and Simon Levy with reference to creating a trust.

Plaintiff's daughter Ruth, however, urged her father to reconsider, and suggested that there was no reason to have a third person, a stranger to the family, act as trustee, and that she and her sister Flora could just as easily take the title to the property as cotrustees for his benefit. Simon Levy agreed, and pursuant to that plan he conveyed both the building and the vacant land to his daughters by quitclaim deeds. No consideration was paid for the property by the daughters at any time.

After the conveyance, plaintiff continued to exercise all indicia of ownership. He collected rents, entered into leases with the tenants, paid for repairs, decorating and janitor expenses and taxes of over $900 a year. He paid his son-in-law, Harold Meyer, $50 for a refrigerator. Attorney Gilbert, one of defendants' witnesses, admitted that Simon Levy always treated the property as though it were his, and listed it, and the income or loss therefrom, on his income tax returns, which were offered in evidence but rejected. At no time did he give his daughters statements of receipts and disbursements, nor did they ever request such accounts. Moreover, they recognized him as the owner and lessor of the building.

In that connection, Mrs. Frank Padden, wife of the superior court judge, testified that she belonged to a club to which Flora and Ruth were members, and that in Sep-

tember, 1949, while she, two other women, and the sisters were riding in a car, in the course of conversation Mrs. Padden asked one of the women how she was making out with the property left in trust to her family, and Ruth Meyer commented, "That is the way Flora and I have papa's property in trust." The other women present also testified that Ruth made that statement.

In 1941, plaintiff leased a second-floor apartment to his daughter Flora and her husband, for which they have continuously paid rent to plaintiff.

In 1942, plaintiff negotiated a loan for $13,000 with the Reconstruction Finance Corporation and signed the note, as did Flora, her husband, and Ruth and her husband. The latter, however, refused at first to sign the mortgage on which his signature was necessary in connection with any inchoate dower rights, since his wife was the record title holder. He finally agreed to sign after he was reassured by an uncle that he would be indemnified if he ever had any liability on the instrument. Harold Meyer at no time contributed any sum for the premises. Plaintiff alone paid the monthly installments of $130 and taxes of $50, as well as some additional fees of $2000, and ultimately reduced the mortgage to $600.

Shortly after the death of Ruth on December 27, 1949, Harold Meyer and his daughter Arlene, and Flora Goldberger and her husband conveyed the property to a third person, who reconveyed it to Flora and Arlene as tenants in common, in order to clear the legal title. Flora, recognizing that her right to the property had always been as a trustee only, reconveyed her interest in the property to her father. However, Arlene Meyer has refused to reconvey her interest to plaintiff, and claims the property in her own right.

On the basis of the foregoing evidence adduced before the master, he recommended that plaintiff be denied relief, in a legal opinion for which a charge of $2746.80 was

made for 178 hours of work. The opinion first fully analyzed the contentions of the parties, and then stated that it was unnecessary to rule on defendants' defense of *laches,* but noted nevertheless that plaintiff was guilty of *laches.* It further stated: "Neither is it necessary to embark upon any extended analysis and balancing of the evidence, nor to review the numerous objections to the competency of witnesses and to the admissibility of evidence, because we assume, without deciding, that the evidence established the absence of any donative intent on the part of Simon and the fact of transfer to the girls upon oral express trust as alleged."

The master then proceeded to hold in that opinion that the cross complaint must be dismissed as a matter of law because the Statute of Frauds makes oral trusts unenforcible, and plaintiff's theory of resulting trust was inapplicable. That analysis of the law was followed by a further discussion of the concept of constructive trusts, which concept was deemed inapplicable since the master found no fiduciary relationship existed between the father and daughters herein.

In his first supplemental report, for which an additional charge of $150 was made, the master analyzed all the law pertaining to the doctrine of *laches,* and concluded that because Simon Levy, who was then 83 years old, did not take immediate action to assert his right to the property after the death of his daughter Ruth, and because he allowed the title to be cleared and held in the name of his daughter Flora, and his granddaughter, Arlene, hence he was guilty of *laches.*

In his second supplemental report, for which an additional $180 was charged, the master analyzed the law relating to the Statute of Frauds, and cited *Compton* v. *Compton,* 414 Ill. 149, as an appropriate and determinative authority for dismissing the cause.

In accordance with the master's recommendations, the court, after a change of venue by defendants, entered a decree dismissing the countercomplaint of Simon Levy for want of equity.

Plaintiff's rights, if any, are predicated upon the establishment of a constructive trust as alleged in the amended countercomplaint. A constructive trust is a creation of the court, and will be imposed where there is some actual fraud or overreaching, or where there is a fiduciary relationship whereby one of the parties has obtained title to property which he ought not, according to equity and good conscience, hold and enjoy. (*Stein* v. *Stein,* 398 Ill. 397.) In order to prevent the perpetration of such a wrong, the courts, by construction, raise a "trust" converting the holder of the legal title into a trustee, and will enter the requisite orders to protect the rights of the wronged parties. *Giese* v. *Terry,* 382 Ill. 34.

In the instant case the evidence clearly establishes that at the time plaintiff conveyed the property to his daughters, and continuously thereafter, there was a close family relationship. They visited and dined together daily, and consulted each other on business matters. It is uncontroverted, moreover, that Simon Levy conferred with his daughters on November 14, 1938, and told them of his conversation with his good friend, Louis Glanz, a real-estate man, who suggested that Simon Levy convey his property in trust to Louis's brother Alex. Louis Glanz corroborated the fact that there had been such a conversation and plan. Plaintiff's daughter Ruth, however, urged her father not to convey to a third person, a stranger to the family, but suggested that he convey the legal title to her and her sister Flora, and that they would hold the property in trust for him. She said, "Why do you go to a stranger when you have Flora and I. We will do the same thing for you as Alex would. We will hold it until you are

ready to take it back." The next day a deed conveying the property to plaintiff's daughters was prepared.

Under the foregoing circumstances, it is clear that but for the close relationship between the parties, and Ruth's proposal, Simon Levy would not have conveyed the property to his daughters, but rather to Alex Glanz, hence the conveyance was obtained by virtue of a fiduciary relationship, and a promise to hold the property in trust. The fact that Simon Levy did not consult his daughters on every detail of management of the property, and had some knowledge himself, did not negate the existence of that relationship of trust and confidence, as defendants urge.

The evidence is overwhelming that after the conveyance the parties, including defendant Harold Meyer, continued to regard Simon Levy as the owner of the premises. Ruth Meyer and her husband paid rent to plaintiff as they had in the past, and Ruth publicly acknowledged that she and her sister held their father's property in trust, according to the testimony of Mrs. Padden, and the other persons present when the remark was made. Harold Meyer at no time regarded himself as having any interest in the premises, and had refused to sign the mortgage in connection with his inchoate right of dower until he was promised to be indemnified in case any liability ever arose. Simon continued to exercise the same rights of ownership, and accounted to no one for his disbursements. He alone paid off the mortgage and listed the property on his income tax return. In that connection it is interesting to note that defendants, who objected to the admission in evidence of such income tax returns, complain in their briefs that the tax returns were not in evidence.

It is therefore apparent that defendants' assertion that Simon Levy never claimed any beneficial interest in the property before the death of his daughter Ruth is not supported by even a scintilla of evidence. On the contrary, it was not until after Ruth's death, when plaintiff was

over 83 years of age, that anyone other than he claimed ownership of the property. At that time, as hereinbefore noted, Harold Meyer signed a deed to clear the legal title and place it in the names of plaintiff's granddaughter Arlene Meyer and daughter Flora Goldberger as tenants in common. Harold Meyer and his daughter then maintained that Simon Levy had no interest in the property, but was merely their agent, and through their attorney they demanded that he account to them for rents and expenditures. Such accounts were prepared by an attorney procured by Flora Goldberger, and Simon Levy did not even see the letters sent to defendants. Thus defendants' assertion that Simon Levy permitted himself to be designated therein as a manager or agent is another gratuitous assumption. Moreover, it is rebutted by the testimony of Flora Goldberger, who stated that her father at no time acted as agent but was the owner of the property.

In the light of the foregoing facts there is the requisite clear and convincing proof that the property was conveyed by virtue of a fiduciary relationship and at the behest of one of the parties who promised to hold it under a trust arrangement. No consideration was paid by the grantees, nor was the property conveyed in consideration of love and affection, nor was it intended by the parties that there be any change in ownership, nor did they comport themselves as though ownership had been transferred. To permit persons claiming through one of the said grantees to now repudiate that trust, and hold the property in their own right would be to perpetrate a fraud and a gross inequity, and therefore a constructive trust should be imposed. *Stahl* v. *Stahl,* 214 Ill. 131; *Stein* v. *Stein,* 398 Ill. 397.

The master, the chancellor and appellees in their brief rely heavily upon the case of *Compton* v. *Compton,* 414 Ill. 149, as a determinative authority for refusing relief herein. In that case the father was a lawyer, and without

the knowledge of his son who was then residing in California, he conveyed certain property to the son. The father made annual reports to the son of the amounts collected from the property so that the son could include the data in his income tax returns. Moreover, the father wrote the son a letter in which he stated, "but the home and farm are yours and the home is worth $6000 and the 80 is worth $12,000 so you have a good equity in both properties." The court stated, at page 157: "While the parties here are father and son there is no evidence that the son induced the father to make the deeds to him. On the contrary, the evidence is uncontroverted that the deeds were made by the father of his own volition and that the son did not know about them until afterwards. The record is barren of any evidence that the son ever said or did anything to induce the father to make the deeds. The uncontradicted evidence is that the plaintiff is a lawyer and that he is exceedingly familiar with real-estate transactions. * * * He did not confer with his son as to what he should do, nor did he ask any advice of his son. No doubt he considered himself better qualified on that score than his son was. He deeded these two pieces of property to his son and had the deeds recorded and then wrote and told his son what he had done."

In the instant case the father was not a lawyer versed in the operative effect of deeds, but an old and poorly-educated individual; the father herein, in contrast to the *Compton case, did* seek the advice of his children, and was induced to make the conveyance by his daughters who agreed to hold the property in trust for him; unlike the father in the *Compton case,* he at all times regarded himself, rather than his children, as the owner of the property, and he alone included it in his income tax returns.

Nor is it clear how the doctrine of *laches* could be invoked to deprive plaintiff of his property. From the date of the conveyance in 1938 to the date of the death

of Ruth Meyer on December 27, 1949, Simon Levy was recognized as the owner of the property, and his daughters regarded themselves as merely trustees holding the legal title for his benefit. Hence there was no reason for him to institute proceedings against anyone during that interval. It was not until after the legal title was cleared following the death of Ruth that any adverse interests were interposed, and within a few months thereafter Simon Levy asserted his legal rights. Hence his conduct could not be deemed to constitute a want of due diligence in protecting his legal interests which in any way prejudiced defendants. *Freymark v. Handke,* 415 Ill. 360.

Under our analysis of this cause, the decree entered by the circuit court of Cook County in accordance with the reports of the master was contrary to the evidence and to the law, and should properly be and is reversed, and the cause remanded with directions to grant plaintiff the relief prayed for in the amended countercomplaint, with the master's fees chargeable to the defendants.

*Reversed and remanded, with directions.*