(No. 15145.—Reversed and remanded.)

JOHN E. WINKELMAN, Appellee, *vs.* LAURA M. WINKELMAN *et al.* Appellants.

*Opinion filed February 21, 1923—Rehearing denied April 6, 1923.*

1. TRUSTS—*when conveyance from parent to child does not create trust as to other children.* Where a father having three children conveys to a daughter, "in her own right in fee simple," nearly all his real estate, which was worth about $100,000, a trust in one-third of the property in favor of each of the other children is not established by evidence that although nothing was said in regard to the grantee sharing the property with them, the grantor thought the grantee would do the right thing with her brother and sister; and the fact that the grantee, after the conveyance was made, expressed her intention of sharing the income with the other children does not change the title acquired by the deed.

2. SAME—*what evidence is necessary to support a constructive trust.* Where it is sought to establish a constructive trust by parol testimony the proof must be clear and convincing and so strong, unequivocal and unmistakable as to lead only to that conclusion, and if the evidence is doubtful or capable of reasonable explanation upon theories other than the existence of the trust it is not sufficient to support a decree declaring and enforcing the trust.

3. DEEDS—*when fiduciary relation does not affect conveyance.* Where a deed is the voluntary act of the grantor, with full knowledge of its nature and effect, and expresses his desire and purpose, the existence of a fiduciary relation between the grantor and the grantee will not affect the conveyance.

APPEAL from the Circuit Court of Cook county; the Hon. HUGO M. FRIEND, Judge, presiding.

WINSTON, STRAWN & SHAW, (JOHN C. SLADE, and T. IRVING CHRISTOPHER, of counsel,) for appellants.

FASSETT, ABBOTT & HUGHES, (JOHN E. HUGHES, and EDWIN H. ABBOTT, of counsel,) for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This appeal is prosecuted from a decree of the circuit court of Cook county declaring a constructive trust in certain real estate conveyed to one of appellants, Laura M. Winkelman, by her father, Frederick A. Winkelman, and his wife, Almira. The deed was executed September 27, 1918. Frederick A. and Almira Winkelman had three children,—appellants, Laura M. Winkelman and Augusta W. Davidson, and appellee, John E. Winkelman. John and Augusta were not living at home with their parents when the deed was executed, but Laura was and always had been living with them and continued to live with them until after the death of both parents, which occurred since the commencement of this suit. The property conveyed by the deed was of the value of about $100,000, and with the exception of the grantor's homestead and a residence property in Washington, D. C., was all the real estate the grantor owned. The grantee was an unmarried woman forty-five years old, was employed as a teacher at the Lewis Institute, in Chicago, and had always resided with her parents. Appellee was thirty-seven years old at the time the deed was made and lived with his parents until August 31, 1918, when he was married and moved elsewhere. Augusta was older than the appellee and has resided in New York since 1903. The deed is a warranty deed conveying the premises to Laura M. Winkelman, daughter of the grantors and a single woman, "in her own right in fee simple, without participation of any possible future husband or any other persons or grantees whatsoever." The bill was filed February 7, 1921, and made Frederick A. Winkelman, Almira, his wife, Laura M. Winkelman and Augusta Davidson defendants. Appellee's contention is that the conveyance was made

to Laura in trust, to be divided equally among the grantor's three children upon the death of himself and wife.

The bill alleges the grantor at the time he made the deed was seventy-seven years old, had for months been sick and was feeble in body and mind, by reason whereof he was easily susceptible to the influence and persuasions of his daughter Laura, and she corruptly contriving and intending to defraud and deprive complainant of any participation in or enjoyment of any of the property, by undue persuasion and importunity and the overpowering influence exercised by her, and by means of false and fraudulent representations, caused her father to execute to her a warranty deed without any consideration; that the property conveyed was of the value of $100,000; that grantor had two other children living besides the grantee, to whom he intended to devise equal shares in said property; that Laura was living with the grantor in his home, managing it for him and assisting him in business transactions, acting as his agent, and was also supervising the care and nursing of grantor, and he reposed in her complete confidence and trust; that at the time the deed was made complainant was absent from home and Augusta resided in New York, and that Laura had ample opportunity to exercise her influence over her father and abuse the trust and confidence he reposed in her. The bill charges Laura well knew the intention of her father to devise the property in equal portions to his children, and for the purpose of defrauding complainant falsely represented to her father that if he would convey the property to her she would manage it for him, pay the net income to him for his life, and to his wife, if she should survive him, during her lifetime, and upon the death of the survivor she would pay the net income from the property in equal shares to herself, her sister and complainant, until such time as her brother and sister, or either of them, demanded a conveyance of an undivided one-third of the property, and immediately upon demand she would convey

and deliver to them each a one-third interest; that such a conveyance, she represented, would be advantageous to the grantor, and she impliedly threatened that if he did not make the deed she would leave his home. The bill alleges that because of the grantor's age, health, situation and confidential relation to this daughter, and because of her knowledge of his affairs, the absence of the other children from home and because of the confidence he reposed in her, and because of his fear she would leave his home, leaving himself and wife alone in their old age, he was induced by said false and fraudulent representations and undue influence to convey the real estate to his daughter Laura; that the deed was not the act of the grantor but was procured by the grantee through gross abuse of the trust and confidence reposed in her by the grantor, by which he was deceived and his will and intent were overpowered and controlled; that the complainant first learned the deed had been made about July, 1919, and immediately sought to discover the circumstances under which it had been made; that he disaffirmed the deed and demanded that Laura execute a declaration of trust and give an accounting of her management of the property; that he had notified Laura she had procured the deed by fraud and undue influence and demanded she fulfill her representations made to the grantor, by means of which she procured the deed; that for a time Laura beguiled the complainant into delay by representing that she would straighten the matter out or adjust it to the satisfaction of all concerned, and finally, when he made an unequivocal demand that she execute a declaration of trust, she refused to do so and declared she was the exclusive and absolute owner of the property, whereupon he filed the bill. The bill prays that Laura be decreed to hold the title to the real estate in trust; that she be decreed to convey one-third of it to complainant and one-third to her sister, Augusta, and that she account for the income. The bill alleged personal property was conveyed to Laura by her father at the

same time the deed was made, but the court found and decreed against complainant on that proposition, and as no question of personal property is involved in this appeal we have omitted the references in the bill to personal property.

Laura answered, denying all the charges of fraud and misrepresentation or that she solicited or persuaded her father to make the deed; denies he was feeble in mind and easily influenced, and avers he was in full possession of his mental faculties and capable to transact any business not requiring physical exertion, and was capable to exercise sound judgment in business matters and in the management and disposition of his property; avers the grantor made the deed on his own initiative, without persuasion, solicitation or procurement of any kind, and denies she made any promises, representations or false or fraudulent statements to induce him to make the deed; avers she has always lived with her father and mother, and has always enjoyed the trust, confidence and affection of her father, such as usually exists between parent and child, but denies that she acted as her father's agent in the management of his business or that any relation of trust or confidence existed between her and her father growing out of any relation of principal and agent; avers her father always managed and directed his own affairs; that he was engaged in the real estate business, was familiar with the management, handling and conveyance of real estate and the drawing of deeds and other instruments affecting the title to real estate, and had up to a short time before the date of the deed maintained an office for the transaction of business; that about two months before the deed was executed he was afflicted with an illness which affected to some extent the use of his limbs, so that he was no longer able to move about as actively as before, but his illness in no manner affected or impaired his mental faculties or his capacity to manage and direct his business not requiring considerable physical exertion; that

the deed, except the printed portions, was written by him and was executed and delivered on his own initiative, wholly without persuasion, solicitation or importunities of respondent; that he knew the contents, the intent, purport and effect of the deed, and that he intended it as an absolute conveyance of the property to her, and that it was made for a good and valuable consideration; denies the property was conveyed to her in trust, as alleged in the bill. The answer also relied on the Statute of Frauds.

The grantor, Frederick A. Winkelman, answered the bill, denying he was feeble in mind and easily influenced by persuasions of Laura, and averring he was, when the deed was made, in full possession of his mental faculties, capable of exercising sound judgment in business matters and the management and disposition of his property; avers he drew the deed himself, except the printed portions; that he knew its contents, purport and effect, and intended it to be an absolute conveyance to Laura, and there was no understanding or agreement made between himself and Laura, or intended to be made, whereby she should hold the property in trust, but, on the contrary, it was intended that she should hold the title absolutely in fee simple in her own right; that the deed was executed and delivered on his own initiative for a good and sufficient consideration, without any solicitation, persuasion or representations on the part of Laura; that at the time it was made he had full right and authority to dispose of the property in any manner he saw fit.

Augusta W. Davidson answered the bill, denying her father was feeble in mind and easily influenced or that the deed was procured by Laura by any fraudulent or false representations, and averring that at the time the deed was made the grantor was capable of determining the disposition he wished to make of his property, and she believes he had a complete knowledge and understanding of the purport of the deed.

The cause was referred to a master in chancery to take the proof and report his conclusions. The master reported, recommending a decree that Laura M. Winkelman held the property in trust to pay the net income to the grantor during his life and upon his death to convey one-third of it to complainant, one-third to Augusta W. Davidson and retain one-third herself. Objections to the master's report were overruled and renewed as exceptions before the chancellor. The chancellor overruled the exceptions and entered a decree in accordance with the recommendations of the master. From that decree Laura M. Winkelman and Augusta W. Davidson have prosecuted this appeal.

The contentions of appellants are (1) the decree is contrary to the evidence; (2) there is no equity in the bill and it states no cause of action or right to relief; (3) the facts found in the decree are at variance with the facts alleged in the bill; (4) the relief granted is upon grounds not charged in the bill and includes relief not claimed in the bill; (5) the decree adopts an erroneous theory of law relating to constructive trusts as a basis for the relief granted.

In support of the decree the appellee contends that the proof establishes the conveyance was made to Laura in reliance upon her promise to dispose of the property after the death of the grantor and his wife, one-third to each of the three children; that a confidential relation existed between grantor and grantee, and that Laura did not intend to keep the promise at the time she made it. It is not contended the proof shows the deed was procured by the undue influence and persuasion of Laura. The decree finds it was not so procured but that the conveyance was the free and voluntary act of the grantor, who was mentally competent to make it. The decree finds the deed was made on the parol agreement of Laura to hold the title in trust, pay the net income to the grantors, and upon the death of the survivor to convey one-third to appellee and one-third to

Augusta, and that she did not intend to keep that promise. The decree also finds there were no false representations "of existing facts" made by Laura to procure the deed, but her only fraud was her intention not to keep her promise, her denial of it and her claim of absolute ownership.

The first thing to be determined is whether the deed was made in reliance upon a promise of the grantee which she did not intend to keep. If it was not, many of the legal questions argued by counsel will not require discussion. Did appellee prove Laura promised her father she would hold the title in trust for the benefit of the three children? The only persons who could have known how the deed came to be made at the time it was made were the grantors and Laura. The wife died two days after she was served with summons. Laura testified, and emphatically denied she requested or solicited her father to make the deed. She testified she was not at home when it was made, that it was written by her father, (which is admitted,) and when she returned home that evening her mother told her at the dinner table about the deed and that she would find it on the piano. The father was ill and remained in his room, where his meals were carried to him. After dinner witness found the deed in the place where her mother said it was. She did not remember that she talked with her father that evening about the deed, but she did talk to him about it afterwards. She had the deed in her possession continuously, and her father knew she had it. He told her to have it recorded at once, and told her the income from the property was to be used for the support of himself and wife as long as either of them lived. The grantor's special charge was that his wife should be taken care of by Laura. Making the deed was never discussed or talked about to Laura by anyone before it was made. She testified she had no knowledge or information it was to be made before it was executed, and there was no conversation or agreement between her and her father as to

how the property was to be handled or disposed of. She denied she promised her father to hold the title in trust and distribute it among the three children when he and his wife were dead.

Before the testimony was concluded before the master, counsel for appellee requested the master to call the grantor, Frederick A. Winkelman, as the court's witness. It appears he was afflicted with heart disease and his ability to attend and testify was doubtful. The master caused a physician to see Winkelman to ascertain his condition, and he was produced before the master. He was very hard of hearing, and it is apparent from his testimony he was in rather bad condition. He died before the decree was entered. The master first examined him, and in answer to the master's question he testified he remembered making the deed to his daughter. When asked what he said to Laura before or at the time he made the deed he replied he did not know that he could tell. Asked if he said anything to her as to what she was to do with the property he said no; he told her in a general way to pay herself for services she had rendered; said she had done a great deal for us; did not know of anything Laura said. Asked what he intended Laura to do with the property, he said first of all he wanted her to pay herself for all she had done; he did not know that he made any special request of her; "later on, an equitable division would have to come between the heirs, I suppose;" could not say he told Laura that. At the request of counsel for appellee the master asked the witness if he intended by the deed to deprive appellee of any interest in the property, and he replied no—nothing of that kind; that Laura and Augusta rendered services and he would like to have them equitably paid; he would like to be just between the children. At the request of counsel for appellants the master asked witness if he understood the deed to be an absolute conveyance, and he said he did; that he left it to Laura to do the fair thing. Asked if when he made the

deed he intended to put it in Laura's power to decide what to give her brother and sister, he said he did not think that was ever contemplated; his intention was to give them all an equal share of what there was. Asked if he understood the deed gave Laura absolute title he said yes; there was no doubt about that. At the request of counsel for appellee the master asked the witness if he made the deed to Laura because he had trust and confidence in her; he said he wanted Laura paid, as far as the estate would pay, for what she had done; that she had been a faithful girl.

We have endeavored to set out Winkelman's testimony fully. His testimony and that of Laura was the only testimony of witnesses who were present at and before the time the deed was made, and that evidence certainly does not prove Laura promised to hold the title in trust for the benefit of all three children. The testimony of Winkelman seems to indicate he thought Laura, after paying herself for her services to the grantors out of the property, would share the remainder with her brother and sister, but he did not testify he asked Laura to do that or that she ever promised to do it.

Appellee places much reliance on other testimony and statements made and upon letters written by Laura after the deed was made. He testified that in June, 1919, he went from Grand Rapids, Michigan, to Chicago at Laura's request; that she talked to him by telephone before he went to Chicago and told him their father was considering selling the Armitage property (a part of the property described in the deed, which had not then been recorded,) for $18,000. Appellee told his sister it was worth more money and he would come over as soon as he could; that he went to Chicago early in June, 1919, and talked to his father, mother and sister; that Laura told him her father was trying to sell the property at a sacrifice and she wanted to stop him; that she had her father deed her his property as soon as she could after he was ill for fear something like that would

happen. Appellee said he did not see why his father had not deeded the property to the three children jointly, and Laura said she told her father if he deeded it to her she would use the income for his and the mother's support while either of them lived and when both died she would divide it equally among the three of them; that Laura said she had quite a time persuading her father to make the deed; that it was impossible for him to manage the property, and finally with her mother's help she succeeded in getting him to make the deed. Laura told appellee he could trust his sister and she would see that he got his interest. Appellee advised Laura to record the deed and prevent the sale, but the Armitage property was sold by Winkelman for $20,000, and Laura afterwards made a deed confirming the sale.

Appellee testified he had begun efforts in November, 1919, to get Laura to sign a declaration of trust. These efforts led to several interviews and some correspondence. Under date of December 27, 1920, Laura wrote appellee concerning the matter and said: "If you ever think over matters quietly and calmly I think you will realize that your father has been trying as best he could to make it possible for you to have some property, and he has endeavored to safeguard matters. I am entirely satisfied to acknowledge my trusteeship to Augusta and you. The only reason any of us will have as much of an income net, finally, is because the Northern Trust Company will not have the property to care for. This original arrangement was made to conserve things, since, when the will was drawn, you were not deserving of confidence as you are now." The will referred to was a will executed by Winkelman in 1912, by which he treated all his children equally in the distribution of his property and appointed the Northern Trust Company and his daughter Laura executors and trustees. Under date of January 23, 1921, Laura wrote appellee complaining of statements his counsel had made misquoting what she had said, and said: "I was very careful to tell

him that the deed or gift was given me with full instructions what to do and that I intended carrying these out to the letter, and that the arrangement was made because of certain family affairs or considerations."

While the controversy was pending between appellee and Laura about the deed, Augusta Davidson wrote the appellee some letters which she sent to Laura for her to read and then forward to appellee, and he contends these letters forwarded to him by Laura are the same as admissions made by her. Under date of December 4, 1919, Augusta wrote appellee inquiring the particulars of his "fuss" with Laura and the nature of his charges. In the letter, which is a lengthy one, she said: "Of course, I also have interests to the extent of one-third but have preferred to let Laura look after them, as she herself was also interested to the same extent and would naturally be keener on the job than an entire stranger." Under date of January 26, 1921, Augusta wrote appellee, among other things: "I certainly do not know what you are thinking of to do such a thing in view of the fact that both Laura and I have expressed a willingness to do what was fair and in view of your knowledge of affairs at home. * * * Laura and I have repeatedly expressed our willingness to do what was right and fair, but we cannot be expected to sign papers at your behest without knowing what we are getting into." Under date of December 30, 1920, Augusta wrote appellee complaining bitterly against his proposed court action, and said: "You know perfectly well that your interests are amply safeguarded and that we welcome your help and value your experience and ability. If you force us into court with a loss of prestige and money, directly and indirectly, which such action would entail, you could never expect your sister to feel the same toward you again. Now and always we want to be fair." On January 28, 1921, Augusta wrote appellee she had been informed he had commenced suit. She referred to a letter he had written her about certain trust

forms he demanded should be executed, and said: "Laura certainly could not be expected to sign any papers without knowing exactly what such action would imply, what responsibilities, etc." We have endeavored to set out the portions of the letters relied on by counsel as showing an acknowledgment by Laura that she held the title in trust for the three children.

Appellee was diligent and persistent in trying to get Laura to sign a declaration that she held the property in trust, and he testified to several admissions made by her that she held the property for the three children, share and share alike; that she would obey her father's instructions; that she promised to sign a declaration of trust, and that she said she received the personal property of her father under the same agreement. One occasion was in the office of appellee's counsel after the bill was filed, when he testified his counsel asked Laura if she received the property under certain instructions from her father and she replied she did, and to a question of counsel that when she received the property she promised to use the income for the support of her father and mother and at their death divide it equally between herself, her brother and sister, she said yes. Appellee testified Augusta was present. She and Laura denied any such statement was made, and Laura denied ever making any such statement to appellee at any time or place, and testified she always refused to sign any paper for her brother that she held the property in trust. She testified her intention was to use the income for the support of her father and mother, and after they were dead to divide the net income equally among the three children, and she so told appellee. She said she thought that was the fair thing for her to do, because they were her brother and sister.

We have referred, we believe, to the testimony of all the witnesses who testified about anything having a bearing on the nature of Laura's title. To our minds it seems entirely insufficient to establish that Laura made any prom-

ise at the time the deed was made that she would divide with her brother and sister after her father and mother were dead. She testified she did not, and her father's testimony supports her. It is true he testified he supposed later an equitable division would come between the heirs, but he did not say anything of that kind was said when the deed was made, or that Laura made any promise of that kind, or that the other children were to have any share in the property. He testified he understood he was giving Laura a warranty deed; that it gave her the property; that there was no doubt about that. At most, his testimony indicates that he intended to vest the title absolutely in Laura, and that she might give her brother and sister a share of what remained after the death of himself and wife and after Laura had received pay for her services in caring for them, but according to his and Laura's testimony he made no request of that kind and Laura made no promise. The transaction was complete when the deed was made and delivered, and any verbal statement Laura made afterwards, if she did make any, would not change her title. What Laura said in her letter of December 27, 1920, about being satisfied to acknowledge her trusteeship to appellee and Augusta is not incompatible with her expressed intention to share the net income of the property with them, which she testified she was willing and intended to do, but that was not the kind of a declaration appellee had proposed and demanded that she sign. The only instruction the grantor gave Laura about the property was, that she was to use the income, while he and his wife lived, for their support. Both the parents were old people, about seventy-seven years old, and it could not be known how many years they would live. The father was not in good health, but the mother at the time the deed was made appears to have been in good health. There is no evidence that there was any marriage of Laura (who was forty-five years old) then in contemplation, but it is evident her parents contemplated she would care for

them the remainder of their lives. The conveyance, which the grantor himself prepared, was to Laura, "daughter of said grantors, a single woman, in her own right in fee simple, without participation of any possible future husband or any other persons or grantees whatsoever." That language is not consistent with appellee's claim that the property was conveyed in trust. The proof abundantly shows the grantor was in full possession of his mental faculties and that he was engaged many years in the real estate business. That he was recognized as a man of good business ability and judgment is shown by the fact that he had been for many years chairman of the finance committee of the Universalist General Convention. That committee was composed of men of high standing, representing several States, and had charge of the property and investments of the Universalist church throughout the country.

We are not unmindful of the general rule that when the evidence is conflicting the decree of the chancellor will not be reversed unless manifestly against the weight of the evidence. We hold in this case the decree is against the manifest weight of the testimony. The three things the appellee contends the weight of the proof establishes are: (1) The promise or representation in reliance upon which the deed was made; (2) the grantee's intention not to keep the promise; (3) the confidential relationship between grantor and grantee. In view of the conclusion we have reached that the proof did not justify the decree we shall not discuss the legal questions argued in the briefs, whether, if the evidence did establish the contentions of appellee, the decree was justified under the bill and the proof.

It has always been the rule that where it is sought to establish a constructive trust by parol testimony the proof must be clear, convincing, and so strong, unequivocal and unmistakable as to lead to but one conclusion. Many of the cases hold the proof must be clear beyond reasonable doubt. If the evidence is doubtful or capable of reason-

able explanation upon theories other than the existence of the trust it is not sufficient to support a decree declaring and enforcing the trust. *Streeter* v. *Gamble,* 298 Ill. 332; *Baughman* v. *Baughman,* 283 id. 55; *Ryder* v. *Ryder,* 244 id. 297; *McGinnis* v. *Jacobs,* 147 id. 24; *Reeve* v. *Strawn,* 14 id. 94.

Appellee places much reliance on *Stahl* v. *Stahl,* 214 Ill. 131, and *Hilt* v. *Simpson,* 230 id. 170. In the *Stahl case* the mother owned valuable property. She was on her deathbed and her children gathered about her. By agreement of all of them she conveyed the property to one of her sons without consideration, to hold for the benefit of all of her children, and this court held the grantee took the title in trust for the benefit of all the children. In the *Hilt case* the facts were somewhat different but the principle is the same, and, following the *Stahl case,* it was held a trust existed. In both cases the proof showed the grantee promised the grantor he would hold the title in trust for the benefit of others and the conveyance was made in reliance on that promise. Those cases cannot be controlling here.

Even if a fiduciary relation existed between grantor and grantee, as contended by appellee, the proof, to our minds, was wholly insufficient to authorize the decree. It is very clear Laura's father had great affection for her and trusted her as any parent would love and trust a dutiful child. During his illness she attended to some business matters for him by his direction and he gave her access to his safety deposit box in the Northern Trust Company. She collected checks given her father for rent and deposited the money to her account in the bank, also paid the household expenses and the expenses of her father's illness and did other things for her father of similar character. The proof does not show that the father was subject to the dominion and control of his daughter, but it does show the deed was the voluntary act of the grantor, that he had full knowledge of its nature and effect, and that it expressed his desire and

purpose.  In such case, even if a fiduciary relation existed, unless by reason of that relation undue advantage was taken of the grantor, the conveyance would not be affected.  *Pillsbury* v. *Bruns,* 301 Ill. 578; *Roche* v. *Roche,* 286 id. 336; *Kellogg* v. *Peddicord,* 181 id. 22.

The decree finds, as we have above set out, that the deed was not procured through the undue influence of the grantee but was the free and voluntary act of the grantor, who was mentally competent to execute the deed.  The decree is based on the finding that the only fraud of the grantee was her promise to the grantor to hold the title in trust and her intention not to keep the promise.  We are of opinion the decree is contrary to the evidence, and it is therefore reversed and the case remanded, with directions to dismiss the bill.

*Reversed and remanded, with directions. .*